**SO ORDERED.**

**SIGNED this 23rd day of April, 2007.**

_____
LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE
_____

# United States Bankruptcy Court

Western District of Texas
San Antonio Division

| | |
|---|---|
| IN RE:<br>SI RESTRUCTURING, INC., ET AL.,<br><br><br>*DEBTORS* | BANKR. CASE NO.<br>04-54504-LMC<br>(JOINTLY ADMINISTERED AND<br>SUBSTANTIVELY CONSOLIDATED)<br><br>CHAPTER 11 |

### DECISION ON PLAN ADMINISTRATOR'S MOTION FOR AUTHORITY TO SPEND OR OTHERWISE DISBURSE THE AMOUNT HELD IN THE DISTRIBUTION RESERVE FOR SATISFACTION OF THE WOOLEYS' CLAIMS

BEFORE THE COURT are the "The Plan Administrator's Motion for Authority to Spend or Otherwise Disburse the Amount Held in the Distribution Reserve for Satisfaction of the Wooleys' Claims" ("Motion"), [Doc. # 1694], and the Wooleys' response thereto ("Response"). [Doc. # 1700]. The Plan Administrator and the Wooleys appeared and were heard through counsel at a telephonic hearing on April 19, 2007. For the reasons set out herein, the Court GRANTS the Plan Administrator's Motion.

**Background**

The Court confirmed the Final Plan of Liquidation of SI Restructuring, Inc. and Its Affiliated Debtors ("Plan") [Doc. # 1405] on April 6, 2006. [Doc. #1408]. John and Jeff Wooley, brothers and former insiders of the Debtors, filed several disputed proofs of claim in the bankruptcy case. The Official Committee of Creditors appointed in this case had obtained court authority to pursue litigation against the Wooleys, asserting various claims against the Wooleys, and which, if successful, would alter the Wooleys' entitlements against the estate.[1] The Court granted that approval, and a complaint was filed against the Wooleys on March 28, 2005. As the parties approached confirmation, all realized that the pendency of this adversary proceeding required the parties to arrange for special treatment of the claims of the Wooleys in the Plan, and so negotiated specific language to that end. In the Plan, the Wooleys' claims fall into three categories. *See* Plan, § 2.76. The first category of claims are the jointly-filed, secured claims of both brothers against the estate for $2.9 million. The second category is John Wooley's unsecured claim for $1.8 million. The third is Jeff Wooley's aggregated unsecured claims of $1.6 million. *Id.* (all dollar values are rounded). The Plan deferred determination of all of the Wooleys' claims – including allowance, disallowance and avoidance or transfer of related liens – to the adversary proceeding then pending in this Court. *Id.*[2]

The Wooleys and the Committee (and its successor, the Plan Administrator) entered into a number of agreed orders to protect their respective interests during the pendency of the bankruptcy case and the aforementioned adversary proceeding. The first of the relevant orders is the "Order

---

[1] As described in greater detail below, the claims would offset the Wooleys' claims against the estate, or would deprive the Wooleys of the right to recover against estate assets as secured creditors.

[2] The adversary proceeding is numbered 05-5055.

Granting Motion for Relief from Automatic Stay, or for Adequate Protection, Regarding Secured Claims, and Issuing Preliminary Injunction Pursuant to 11 U.S.C. § 105." ("Lift Stay Order") [Doc. # 1103]. The Lift Stay Order, entered June 23, 2005, preliminarily satisfied the Wooleys' joint secured claims (our first category) by ordering the Debtors to pay $2.9 million to the Wooleys – essentially payment in full on the Wooleys' joint secured claims. Of course, because the claims were still disputed, the Debtors (and the Committee) demanded, and all parties agreed to, protection of the estate's interests in the event that the Wooleys' secured claims were in any way invalidated or otherwise lost. This protection came in the form of a letter of credit, posted by the Wooleys, the terms of which empowered the Debtors (and their successors in interest)[3] to call the letter of credit if, as, and when, the Wooleys lost the legal right to enforce their asserted security interests, as a result of a final ruling in the pending litigation. Thus, as a result of this agreed order, the Wooleys were actually paid in full on their secured claims. The Committee, acting on behalf of the estate in pursuing this litigation, in turn, could only force repayment from the Wooleys (either directly or by means of enforcing the letter of credit) if they first prevailed in invalidating the Wooleys' secured claims.[4]

The Debtors first filed a plan for the estates on October 11, 2005 [Doc. # 1187], then filed an amended plan on December 12, 2005 [Doc. # 1241]. The amended plan was ultimately set for confirmation hearing on March 10, 2006. The plan that was modified to incorporate the final negotiated resolutions of various outstanding objections to confirmation and other related disputes.

---

[3] The precise language referred to "the Debtors' estates," rather than the Debtors as such, a recognition that it was the Committee (with the authority granted it by the court) which was acting on behalf of the estates in pursuing this litigation and so the Committee that had the responsibility for protecting the estates' interests in the litigation. Later, the responsibility was transferred under the Plan from the Committee to the Plan Administrator.

[4] In this way, the Debtors also assured that interest would not accrue against the estate. The Wooleys have been paid, and have the use of their money – and the ability to invest it at interest.

The Plan, as finally amended (and incorporating the negotiated changes the result of various objections to confirmation), was filed with the court on April 3, 2006 [Doc. # 1405], and the order confirming the plan was signed April 5, 2006 [Doc. # 1408]. In addition to the letter of credit previously posted pursuant to the agreed order on the Wooleys' lift stay motion, discussed *supra*, the Plan contained an additional provision relating to the Wooley Claims, calling for the Debtors to set up and maintain a $500,000 distribution reserve for the possible satisfaction of the Wooleys' secured claims (defined in Plan § 2.74, and laid out *supra*). This $500,000 reserve is the subject of the instant dispute. Plan Section 6.1 states:

> Notwithstanding the foregoing, pending further order of the Court after notice and a hearing in Adversary Proceeding 05-5055, the Debtors shall segregate and hold not less than $500,000 in the Distribution Reserve *for satisfaction of any of the Wooleys' Claims that become Allowed Secured Claims*. The Plan Administrator may seek to reduce the amount held for satisfaction of the Wooleys' Claims or seek to spend or otherwise disburse such funds through motion to the Bankruptcy Court. The final allowance or disallowance of the Wooleys' Claims and the validity, extent and priority of the liens securing the Wooleys' Claims shall be determined by the Bankruptcy Court in Adversary Proceeding 05-5055, as provided in the Stipulation Resolving Objections by Creditors John C. Wooley and Jeffrey J. Wooley to Motion for Substantive Consolidation of Debtors' Estates filed September 19, 2005 and accepted by the Court on September 22, 2005.

Plan § 6.1(a) (emphasis added).

The adversary proceeding brought by the Committee against the Wooleys back on March 28, 2005 alleged causes of action in 23 counts, including a variety of breach of fiduciary duty claims (incorporating claims for breaches of duty of care, of duty of loyalty, and for deepening insolvency), gross negligence, and various fraudulent transfers and preference claims. The Committee also sought equitable subordination of the Wooleys' claims under 11 U.S.C. § 510(c).[5] By agreed order on July

---

[5] None of the causes of action actually sought disallowance as such of any of the Wooley claims, regardless their status as secured or unsecured. However, were the Committee to be successful in its various affirmative recovery actions against the Wooleys for breach of fiduciary duties, those actions would have reduced or eliminated the Wooleys' claims by offset or recoupment. The avoidance actions brought under section 547 and 548 (and under state fraudulent transfer law via

27, 2006, the plaintiff (now the Plan Administrator) dropped all of the various breach of fiduciary duty counts, as well as the preference count, electing to proceed solely on its fraudulent transfer and equitable subordination counts. The matter went to trial on these remaining counts, and the Court entered its Final Judgment on February 6, 2007 [Adv. # 05-5055, Doc. # 255].

The Court granted judgment to the Wooleys on the fraudulent transfer counts; however, the Plan Administrator prevailed on his equitable subordination claim. The Judgment reads in relevant part: "any liens and security interests the Defendants may claim against the Debtors' bankruptcy estates are hereby transferred to the Plaintiff for the benefit of unsecured creditors of the Debtors' bankruptcy estates." It also states that "the Proofs of Claim filed by the Defendants in the Debtors' bankruptcy cases shall be treated as general unsecured claims for the purposes of any distributions made pursuant to the [Plan]." Finally, the Judgment directs the Wooleys to return to the Debtors the funds previously distributed to them under the Lift Stay Order.

The Wooleys appealed the judgment to the district court. To protect their appellate rights, the Wooleys sought a stay pending appeal. Prior to hearing on the motion for stay pending appeal, the parties to the adversary *stipulated* to a stay pending appeal, memorialized in "Order Granting Emergency Motion for Stay Pending Appeal."( hereinafter referred to as "Stay") [Adv. # 05-5055, Doc. # 270]. The Stay prohibits the Plan Administrator from executing on the Final Judgment until appeals are exhausted, "provided, however, that nothing herein shall affect, alter or modify the rights of the parties under the [Plan]." (underlining in original).

We can now summarize the parties' positions at this stage, while the appeal is pending. First,

---

the mechanism set up in section 544(b)) would not have resulted in disallowance of the Wooley claims as such, though section 502(d) states that claims are to be disallowed if the entity asserting the claims is one "from which property is recoverable under section 542, 543, 550, or 553" of title 11, or if the entity is one that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a)" of title 11. *See* 11 U.S.C. § 502(d). The equitable subordination action, by statute, is a remedy applied to an otherwise *allowed* claim. *See* 11 U.S.C. § 510(c)(1).

for the purpose of distribution, the Wooleys' claims are all now *allowed*, but general *unsecured* claims. With this status, the Wooleys are, as things now stand, currently entitled to participate *in pari passu* with the other general unsecured creditors holding allowed claims against the estate. But the Wooleys, as things now stand, are also in a preferred position relative to other unsecured creditors because they currently remain in possession of the $2.9 million already paid to them in mid-2005, pursuant to the Lift Stay Order. That is, they have already been paid as though they had an allowed secured claim. True, if the Final Judgment stands (and is enforced), the Wooleys will have to repay the $2.9 million paid to them, plus interest, failing which the Plan Administrator will be able to call on the letter of credit posted by the Wooleys (effectively forcing the Wooleys to repay what they received from the estate). The Wooleys, per the judgment, are no longer entitled to the enjoyment of their status as secured creditors, and so no longer entitled to have been paid as secured creditors (as they were pursuant to the Lift Stay Order discussed *supra*). The stay pending appeal prevents the Plan Administrator executing on the judgment, and so prevents the Plan Administrator from calling the letter of credit until the appeal is finally resolved. Thus, with the Stay order in place, unless the Plan Administrator ultimately prevails on appeal, the Wooleys still remain in possession of the $2.9 million they were paid. What is more, if the Plan Administrator does ultimately prevail on appeal, the Wooleys will still hold an allowed unsecured claim for the same amount ($2.9 million), in addition to their other unsecured claims which are now allowed,[6] and so would still be entitled to share in the distribution of the proceeds of the letter of credit. In other words, even if the

---

[6] The Wooleys' unsecured claims would only have been reduced were the Plan Administrator to have pursued and prevailed on its breach of fiduciary duty claims or its fraudulent transfer or preference claims. The Plan Administrator dropped the breach of duty causes of action, however, and the Wooleys prevailed on the avoidance action. As earlier noted, the equitable subordination action would not have resulted in disallowance as such of any of the Wooleys' claims. In all events, the judgment rendered did not require the subordination of the Wooleys' claims to those of other unsecured creditors. Thus, the Wooleys' previously asserted unsecured claims are undisturbed and untouched by the judgment that was rendered in the adversary proceeding.

Wooleys lose, they were would still receive some of the $2.9 million back as a distribution on their unsecured claims.

On the other hand, if the Wooleys prevail on appeal, they will keep their $2.9 million, because their secured claim will remain undisturbed, and they will *still* share *in pari passu* as general unsecured claimants on the balance of their unsecured claims. In short, the combination of the order on the Wooleys' motion to lift stay (which resulted in the Wooleys being paid $2.9 million at that time, and which also resulted in the posting of the letter of credit in favor of the estate) and the agreed order granting stay pending appeal from the judgment (a judgment which only affected the asserted secured claim of the Wooleys) renders the disposition of the $500,000 reserve in section 6.1(a) of the Plan superfluous to the status of the appeal.

## Discussion

The Plan administrator now seeks to disburse the $500,000 reserve specified in section 6.1(a) of the Plan, and the Wooleys object. The Court first notes that the Motion is authorized by the Plan. Plan § 6.1(a) ("The Plan Administrator may seek to reduce the amount held for satisfaction of the Wooleys' Claims or seek to spend or otherwise disburse such funds through motion to the Bankruptcy Court."). The filing of this Motion is not forbidden by the parties' stipulated stay pending appeal ("nothing herein shall effect, alter or modify the rights of the parties under the [Plan]").

Movant argues that, because the adversary proceeding in this Court has concluded, the funds are no longer required and should therefore be disbursed. Movant focuses his argument upon the last half of Plan section 6.1(a) paragraph 3, which reads "The final allowance or disallowance of the Wooleys' Claims and the validity, extent and priority of the liens securing the Wooleys' Claims shall be determined by the Bankruptcy Court in Adversary Proceeding 05-5055 . . . ." Plan § 6.1(a).

From this language, Movant asserts that the Bankruptcy Court's decision is final for any purpose having to do with the distribution of the reserve. The Respondent retorts that, under the definitions of "final" contained in the Plan, it is premature to permit disposition of this reserve.

The contentions of both parties in point of fact miss the mark, because they focus on the wrong sentence. The Court reads the sentence upon which both parties focus as one which neither confers nor limits any rights of the parties in the bankruptcy. This is a *descriptive* sentence, not a *prescriptive* one. It does not empower the Administrator, nor does it encumber him. It merely identifies where the relevant claims and causes of action involving the status of the Wooleys' Claims will be resolved. Those voting on the Plan (and for that matter, the Wooleys themselves) certainly were entitled to know that that adversary proceeding would be the place – and the only place – where any concerns regarding their claims would be aired and resolved. *See* 11 U.S.C. §§ 1123(b)(3), (6); 1125(a). The sentence is not in any normal sense prescriptive. It does not *direct* any party to do anything, nor does it specify any consequences regarding any action taken.

The prescriptive aspect of the paragraph is found in its first sentence, which states that the $500,000 reserve exists "for satisfaction any of the Wooleys' Claims *that become Allowed Secured Claims*." Plan § 6.1(a) (emphasis added). The Plan Administrator brings this Motion because it is no longer necessary to maintain this reserve "for satisfaction of any of the Wooleys' Claims" because the judgment rendered now makes those claims no longer secured. The Plan Administrator is right that it is no longer necessary to maintain the reserve – but not for the reasons he stated in his Motion.

The Stay (*i.e.*, the stay order pending appeal) does not "effect [sic], alter or modify the rights of the parties under the [Plan]." The Motion is also not forbidden by the Stay itself. The Motion may be granted if the Court concludes that no further purpose is served in maintaining the reserve. The

Administrator is a party, and the right to "spend or otherwise disburse such funds through motion" is expressly granted in Plan Section 6.1(a).

To determine whether the reserve still serves its asserted purpose, we examine whether the reserve could be required for the "satisfaction of any of the Wooleys' Claims that become Allowed Secured Claims." The recitation *supra* shows why the reserve is no longer necessary. Of the three categories of Wooley claims, only the $2.9M claim, asserted to be secured, is at issue in the appeal. Regardless what happens in the appeal, the second and third categories of Wooley claims will be treated as allowed general, unsecured claims in the Plan.[7] What is more, regardless the outcome of the appeal (which addresses only the transfer of the Wooley liens to the estate and the treatment of the asserted secured claim as unsecured), there is no way for those unsecured claims to become Allowed Secured Claims. Thus, all that remains at issue is the secured status of the Wooley Claim for $2.9 million. But that claim has in fact already been paid to the Wooleys. The Wooleys have been in possession of those funds, to invest as they see fit, for nearly two years now. The outcome of the appeal will determine whether the Wooleys have to *return* this money, but in no case will the Wooleys be entitled to "satisfaction" of any *additional* claims.

In summary, there is no way that a successful appeal would entitle the Wooleys to "satisfaction" of an Allowed Secured Claim from the reserve. The $2.9M claim has already been paid to the Wooleys, and their other remaining claims will always be unsecured, regardless of the outcome of the appeal. The reserve therefore no longer serves the purpose for which it is held, and disbursal of the funds is appropriate.

---

[7] Again, recall that the unsecured claims must, at this stage be allowed claims because (a) section 6.1(a) of the Plan states that the exclusive vehicle for challenging any Wooley claims was the adversary proceeding and (b) the judgment rendered in the adversary proceeding grants only one count of the plaintiff's complaint, involving what should happen to the Wooley's asserted secured status. By extrapolation, then, all of the Wooley claims are at this stage at the very least allowed unsecured claims.

The Stay states that the Wooleys "have shown that they are entitled to a stay of the Final Judgment pending appeal in order to preserve the status quo during the appeal process." There is no dispute that the Wooleys are entitled to protect their appellate rights as they existed upon entry of this Court's Final Judgment. Perhaps the Wooleys worry that disbursal of the $500,000 reserve would somehow upset this status quo, but that argument would be specious. First, the parties to the appeal *stipulated* to the express relief provided in the Stay, as the means by which to maintain the status quo. This includes the language preserving the rights of the parties under the Plan ( the "provided, however" clause). If the Wooleys had thought that they needed some other additional protection to preserve the status quo pending appeal, then it was incumbent upon them to see to it that such additional protections were placed in the stipulated Stay order. There is no such additional language regarding section 6.1(a) of the Plan. The "status quo" to which this Stay (and any stay pending appeal, for that matter) refers is the status of the parties' relative rights immediately prior to *execution* of the judgment rendered. *See Umbrella Bank, FSB v. Jamison*, 341 B.R. 835, 839-840 (W.D.Tex. 2006) (discussing the purpose of a supersedeas bond as preserving the *status quo* by protecting the economic interests of the parties against the risks imposed by an appeal). Those rights consisted essentially of protecting the Wooleys from the Plan Administrator's forcing them to disgorge the $2.9 million they were paid in 2005, pending this appeal, and preventing the Plan Administrator from calling the letter of credit posted by the Wooleys pursuant to the terms of the Lift Stay Order entered in 2005. That is all that the judgment affects, nothing more. Whether the $500,000 reserve is distributed or not will have no affect on the parties' relative rights pending appeal. More to the point, the Stay itself, far from extending some additional prohibition on access to this fund, expressly *authorized* the parties to enjoy their rights under the Plan (one of which included the right of the Plan Administrator to ask for the release of these funds when they are no

longer needed for the satisfaction of the Wooleys' secured claims).[8] It is improper for the Court to further revise the Stay after the fact, especially as the stay provisions were stipulated by the parties. To the extent the Wooleys have an interest in maintaining the "status quo," it is protected by the Stay provision prohibiting the Administrator from drawing upon the letter of credit.

It is worth recalling just what is meant by "the status quo" in the context of a stay pending appeal of a judgment involving economic damages. A federal judgment normally entitles a prevailing party to enforce its terms ten days following its entry, regardless whether an appeal is filed. *See Umbrella Bank*, 341 B.R., at 839-840. In the context of a judgment awarding an economic remedy, enforcement normally takes the form of some sort of execution, pursuant to Rule 65 of the Federal Rules of Civil Procedure. *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 11 FEDERAL PRACTICE AND PROCEDURE § 2903 (2d ed. 1995) (noting that, upon expiration of the ten day automatic stay in Rule 62(a), the party in whose favor the judgment runs is "free to have execution on it or to bring proceedings to enforce it").[9] A stay of such enforcement is usually provided in the form of a supersedeas bond, assuring that the prevailing party's recovery rights will not be jeopardized by the delay occasioned by the appeal, and assuring the losing party of the right to prosecute the appeal without fear of facing execution remedies during its pendency. *See id.*; *see also* FED.R.CIV.P. 62(d). Other relief similar to a formal bond may also function as a stay of proceedings, if approved by the court. *See Waffenschmidt v. MacKay*, 763 F.2d 711, 727 (5th Cir. 1985).

In this case, the judgment in question granted equitable relief in the form of transferring a

---

[8] They are no longer needed because the secured claim has already been paid, pursuant to the Lift Stay Order.

[9] Adds the Treatise, a person who does not furnish a supersedeas bond does not lose the right to appeal, though that person would assume the risk of getting his money back again if the judgment is reversed. *See id.*; § 2905, at p. 525.

-11-

lien from Wooleys to the Plan Administrator, for the benefit of the estate's unsecured creditors. The economic effect of this judgment on the Wooleys is that it would entitle the Plan Administrator to seek execution of the remedial portion of the judgment, which directs the Wooleys to repay the estate the $2.9 million they earlier were paid in 2005. The status quo, for purposes of the appeal, is one in which the Wooleys are entitled, during the pendency of this appeal, to be keep their $2.9 million, free of execution efforts by the Plan Administrator, and are further assured that the Plan Administrator will not be allowed to call the $2.9 million letter of credit posted by the Wooleys. It is easy to see that the Stay to which the parties already stipulated assures the preservation of this very status. The disposition of the $500,000 in the reserve held pursuant to section 6.1(a) of the Plan has no affect one way or another on this "status quo." The Wooleys' economic risks, to the extent altered by the judgment, are not affected by the release of the Distribution Reserve, and the Wooleys have neither argued nor otherwise demonstrated to the contrary.

The Motion is GRANTED. The Plan Administrator is relieved from the duty imposed in Plan section 6.1(a) to segregate and hold not less than $500,000 in the Distribution Reserve for satisfaction of the Wooleys' Claims. The Plan Administrator is further authorized to spend or otherwise distribute such funds in accordance with the Plan.

# # #